# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **CAMERON LUKE,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **No. 1:20-CV-00388-DII** |
| | § | |
| **LEE COUNTY, COMMUNITY** | § | |
| **SUPERVISION AND** | § | |
| **CORRECTIONS DEPARTMENT,** | § | |
| **SAN JACINTO COUNTY, TEXAS,** | § | |
| **COMMUNITY SUPERVISION** | § | |
| **AND CORRECTIONS** | § | |
| **DEPARTMENT; AND  LEE** | § | |
| **COUNTY,** | § | |
| *Defendants* | | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:   HONORABLE UNITED STATES DISTRICT JUDGE

Before the Court is Defendants San Jacinto and Lee County Community Supervision and Corrections Departments' ("CSCDs") Motion to Dismiss Plaintiff's Second Amended Complaint, Dkt. 55, and all related briefing. After reviewing the briefing and the relevant case law, the undersigned recommends that the District Court deny in part and grant in part the CSCDs' motion.

## I.     BACKGROUND

The CSCDs move to dismiss Plaintiff Cameron Luke's claim for violations of Title II of the Americans with Disabilities Act. Dkts. 54, at 9; 55, at 9. Luke, who is deaf, requires an ASL interpreter to communicate effectively. Dkt. 54, at 1. Luke claims that after he was arrested for marijuana possession, the Defendants, including

1

the CSCDs, failed to provide him with an ASL interpreter throughout "the investigation, arrest, booking, detainment, arraignment, release, court proceedings, and probation." *Id.* at 14.

After Luke initially filed suit, the CSCDs filed a motion to dismiss, which the District Court granted. Dkt. 19, at 6. The District Court reasoned that Luke's claim against the CSCDs was moot "because [Luke] is no longer on probation or otherwise subject to the conditions of supervision implicated by his claim." *Id.* at 4. In response to Luke's motion to reconsider based on his request for damages, the District Court upheld the dismissal and stated that "[Luke's] claims for nominal and compensatory damages under the ADA do not keep his suit against the CSCD Defendants alive, because such claims are barred by state sovereign immunity." Dkt 22, at 5.[1]

Luke appealed to the Fifth Circuit, which analyzed whether Luke's claims were in fact barred by sovereign immunity or whether sovereign immunity had been validly abrogated. Dkt. 47, at 6.[2] The Fifth Circuit found that Luke successfully

---

[1] The District Court also granted Lee County's motion for judgment on the pleadings, reasoning that "[Defendant's] claims for nominal and compensatory damages against Lee County are barred by state sovereign immunity." Dkt. 40, at 3. The Court then granted the State of Texas's motion to dismiss, reasoning that Defendant was "required to serve the governor of Texas, which he did not do." Dkt. 42, at 4. Rather, Defendant served the Secretary of State. *Id.* at 3.

[2] The Fifth Circuit affirmed the District Court's ruling dismissing the State of Texas from the suit on grounds of improper service. Dkt. 47, at 10. The court reasoned that "[f]or Plaintiffs to sue a state in federal court, they must either (1) serve the state's 'chief executive officer'; or (2) provide service in a manner prescribed by that state's law" and Plaintiff did neither. *Id.* at 10 (quoting Fed. R. Civ. P. 4(j)(2)). The court then reversed the dismissal of Plaintiff's claim against Lee County, stating "Lee County is a political subdivision of Texas, rather than an arm of the State, and thus does not enjoy state sovereign immunity." *Id.* at 6 (citing *Alden v. Maine*, 527 U.S. 706, 756 (1999); *Stratta v. Roe*, 961 F.3d 340, 352 (5th Cir. 2020)). The court further concluded that Luke had "successfully stated a Title II claim," and thus, "his claim against Lee County should proceed past the pleading stage." *Id.* at 9.

pleaded a Title II claim satisfying step one of the [*Georgia*]³ abrogation test." *Id.* at 9. The court vacated the dismissal as to the CSCDs and remanded the case for disposition upon further briefing from the parties as to whether Luke's claims satisfy the second and third steps of the abrogation test. *Id.* The Fifth Circuit also ordered the District Court to determine whether emotional distress damages are available under Title II after finding that Luke pleaded sufficient facts supporting compensatory damages in stating that he suffered "fear, anxiety, [and] humiliation" as a result of the alleged Title II violation. *Id.* at 7.

As an initial matter, the CSCDs have raised new arguments in their motion to dismiss filed after Luke's Second Amended Complaint. Specifically, the CSCDs argue that the *Heck*⁴ doctrine bars Luke's claim because his complaint "impl[ies] the invalidity of his sentence." Dkt. 55, at 21 (citing *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 652 (5th Cir. 2007)). The CSCDs also argue that Luke's claims "turn on vicarious liability, as he only alleges that his probation officers were aware of his request for a certified interpreter," yet, vicarious liability isn't available under Title II of the ADA. *Id.* at 23 (relying on a holding from a Title IX case). Federal Rule of Civil Procedure 12(g)(2)—which provides that a party cannot raise "a defense or objection that was available to the party but omitted from its earlier motion"—bars the Court's consideration of these new arguments. Fed. R. Civ. P. 12(g)(2). Additionally, the Fifth Circuit remanded this case (1) for "consideration of whether

---

³ *See United States v. Georgia*, 546 U.S. 151, 159 (2006).

⁴ *See Heck v. Humphrey*, 512 U.S. 477, 486 (1994).

Congress validly abrogated state sovereign immunity for the claims against the Supervision Departments" and (2) to "decide the effect, if any, *Cummings* has on Luke's ability to recover emotional distress damages under Title II" and nothing more. Dkt. 47, at 7-8. The undersigned will not deviate from the Fifth Circuit's mandate. *See Briggs v. Pa. R.R. Co.*, 334 U.S. 304, 306 (1948) ("In its earliest days this Court consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court.").

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject-matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts

evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

## III.   DISCUSSION

### A.   *Georgia* Analysis

The Supreme Court in *United States v. Georgia* established a three-part test for determining whether Title II validly abrogates states' sovereign immunity. 546 U.S. at 159. A court must determine, on a "claim-by-claim basis":  (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. *Id.*

The Fifth Circuit has already determined that Luke has sufficiently stated a Title II claim based on his allegations that the CSCDs "knew he was deaf yet failed to provide an accommodation despite multiple requests for an interpreter" during meetings with probation officers. Dkt. 47, at 7. Luke's claims, therefore, "satisfy step one of the abrogation test." *Id.* at 9. "The inquiry should now proceed to the second and, if necessary third step" of the *Georgia* abrogation test. *Id.* The question at step two of the *Georgia* test is whether Luke has also pleaded a violation of the Fourteenth Amendment.

### 1.   Step two: implication of Fourteenth Amendment right

The second prong of the *Georgia* test requires the undersigned to determine the extent to which the CSCDs' alleged violation of Title II of the ADA also violated the Fourteenth Amendment. *Georgia,* 546 U.S. at 159. If Luke's pleadings also state

a claim for violation of the Fourteenth Amendment, then sovereign immunity will have been validly abrogated pursuant to Congress's Section Five enforcement powers. Section Five of the Fourteenth Amendment provides that "Congress shall have power to enforce, by appropriate legislation, the provisions" of the Fourteenth Amendment, including the Equal Protection Clause and the Due Process Clause. U.S. Const. amend. XIV, § 5. This permits Congress to create private remedies against the States for violations of the Fourteenth Amendment. *Georgia*, 546 U.S. at 158. As a result, "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159.

a.   Due process

The Due Process Clause guarantees certain fundamental rights, and a violation of Title II violates the Due Process Clause when it prevents people with disabilities from exercising those rights. *Tennessee v. Lane*, 541 U.S. 509, 515 (2004).

The CSCDs argue that Luke has not pleaded a violation of his due process rights for several reasons. First, the CSCDs argue that Luke's due process rights are not implicated in meetings with probation officers since probation officers don't adjudicate legal rights or determine the terms of probation and Luke does not explain the source of his alleged right to a certified interpreter at probation meetings. Dkt. 55, at 12-14. Then, the CSCDs state that, even if Luke did have a right to an ASL interpreter at his probation meetings, "for criminal defendants, the denial of an interpreter is constitutionally infirm only if it made the proceeding 'fundamentally

6

unfair'" and an even lower standard would apply in the probation meeting context. *Id.* Lastly, the CSCDs contend that Luke received fair warning of "acts that may revoke his probation" because he received "clear written notice that detailed his probation terms." *Id.*

Luke responds that Plaintiffs argument is "misconstrued" because the issue is "not whether there is a due process right to an interpreter for meetings with probation officers. Rather, the issue is whether there was a lack of fair warning of acts which may lead to revocation throughout Plaintiff's probation." Dkt. 57, at 3. Luke, therefore, argues that a due process violation arose through "lack of fair warning of acts that may lead to revocation throughout [his] probation." *Id.*

It is well established that due process must be afforded to probationers in connection with the revocation of probation. *Gagnon v. Scarpelli,* 411 U.S. 778, 782 (1973). "An essential component of these due process rights is that individuals be given *fair warning* of acts which may lead to revocation." *United States v. Simmons*, 812 F.2d 561, 565 (9th Cir. 1987) (citations omitted, emphasis added). Additionally, in the trial and hearing context, lack of a qualified interpreter can implicate due process. *See Prince v. Beto*, 426 F.2d 875 (5th Cir. 1970) (finding that the trial court permitting a husband to interpret for his wife in a criminal trial of her assailant was fundamentally unfair and violated defendant's due process rights).

Luke repeatedly frames the due process violation at issue in this case as based in "a lack of fair warning of acts which may lead to revocation throughout [his] probation." Dkt. 57, at 3; *see also id.* at 6 (stating "Plaintiff was not afforded an

opportunity to understand his probation terms and conditions in his primary language"); *id.* at 7 (stating that "Defendants continuously violated Plaintiffs' due process right to fair warnings of acts that could revoke his probation" because "any violation from the meetings or programs [he was required to attend] could have revoked Plaintiffs probation"); *id.* at 8  (stating "Defendants violated Plaintiff's due process right to be given a fair warning of acts that may revoke his probation").

While lack of fair warning of acts which may lead to revocation can constitute a due process violation, each of the cases cited by Luke relate to "proceedings," including jury trials, and disciplinary, grievance, and parole hearings. Dkt. 57, at 4-8. Luke fails to explain how the lack of fair warning was implicated in his meetings with the CSCDs' probation officers. As to his probation Luke states:

> On or about July 18, 2019 [Luke] appeared before a Lee County Judge Paul E. Fischer in Lee County Court without an ASL interpreter and was placed on a one-year probation for his possession of marijuana charge. About three weeks before the hearing, Mr. Luke … requested and got confirmation from the Lee County Court that an ASL interpreter will be provided for the hearing. However, no ASL interpreter was provided to Mr. Luke that day to explain the court proceeding, the decision, or *the terms and conditions of his probation.*

Dkt. 54, at 7 (emphasis added).

> On or about July 18, 2019, Mr. Luke's probation was transferred from Lee County Community Supervision and Corrections Department to San Jacinto County Community Supervision and Corrections Department.

*Id.*

Luke's pleadings do not explain how the CSCDs were involved with setting the terms and conditions of his probation, such that their failure to apprise him of the terms and conditions amounts to a due process violation. In Lee and San Jacinto

Counties, as in all counties in Texas, the "judge of the court" determines whether to "grant community supervision," and makes the decision to "impose conditions," or "discharge the defendant." Tex. Code Crim. Proc. Art. 42A.051. This authority may not be delegated to a probation officer or anyone else. *See DeLeon,* 466 S.W.2d at 574. It is an unauthorized delegation if the probation officer is permitted to determine the terms of probation. *See Cox v. State,* 445 S.W.2d 200, 201 (Tex. Crim. App. 1969). Failure to comply with terms determined by a probation officer cannot be used to revoke probation. *See id.* Further, in a probation revocation hearing, the discretion to either continue the defendant on probation or revoke probation rests in the trial judge. *DeGay v. State,* 741 S.W.2d 445, 449 (Tex. Crim. App. 1987).

Luke has not pleaded that it was the CSCDs that are responsible for the lack of fair warning about the terms of  his probation and the conduct that might lead to revocation because it was not for the CSCDs to set probation terms. Luke has also brought his claims against Lee County which oversees the Lee County Court, and the Fifth Circuit has concluded that Luke has "successfully stated a Title II claim" against Lee County, a political subdivision that does not enjoy sovereign immunity. Dkt 47, at 6. Upon reversal of the District Court's dismissal as to Lee County, the Fifth Circuit stated that Luke's claims against Lee County on the basis of the denial of an interpreter throughout his criminal proceedings "should proceed past the pleading stage." *Id.* at 9. However, for the purposes of the *Georgia* abrogation test as to the CSCDs, Luke has not sufficiently pleaded a Fourteenth Amendment due process  violation as to the CSCDs.

b.      Equal protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). Thus, the Equal Protection Clause serves "as a shield against arbitrary classifications." *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 598 (2008). "Strict scrutiny is required if the [classification] operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *Richard v. Hinson*, 70 F.3d 415, 417 (5th Cir. 1995) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1 (1973)). "The Supreme [C]ourt has explained that fundamental rights, for equal protection purposes, are such rights as: a right of a uniquely private nature, the right to vote, right of interstate travel, and rights guaranteed by the First Amendment." *Sonnier v. Quarterman*, 476 F.3d 349, 368 n.16 (5th Cir. 2007) (citing *Mass. Bd. of Retirement v. Murgia*, 96 S. Ct. 2562, 2566 (1976)). In the absence of a "classification affecting fundamental personal rights or based upon inherently suspect distinctions such as race, religion, or alienage," classifications or unequal treatment are "subject to the same rational basis analysis utilized in due process claims." *Jackson Ct. Condos., Inc. v. City of New Orleans*, 874 F.2d 1070, 1079 (5th Cir. 1989).

The CSCDs argue that Luke has not pleaded a violation of  equal protection because he has pleaded a classification on the basis of disability, which  receives

rational basis scrutiny. Dkt. 55, at 6. The CSCDs contend that their actions in failing to provide an interpreter during Luke's meeting with probation officers pass rational basis review because "it was clearly reasonable for the CSCDs to save money by relying on Luke's mother to interpret for her son." *Id.* at 6. Luke responds that he has pleaded a classification affecting a fundamental right, the right to liberty at stake in the revocation of probation, and that therefore, strict scrutiny applies. Dkt. 57, at 8. Luke states the CSCDs failed to meet their burden of showing that their actions are narrowly tailored to serve a compelling government interest, and thus fail the strict scrutiny test. *Id.* a 9.

The undersigned agrees with the CSCDs. Luke has pleaded a classification on the basis of disability in pleading that "Defendants' actions caused him greater levels of fear, anxiety, indignity, frustration, humiliation, and emotional distress than a hearing person would be expected to experience." Dkt. 54, at 2; *see also id.* at 8 (stating "disability" is a "motivating factor in [Defendants] decisions and other actions."). Under the Equal Protection Clause, disabled individuals are not a suspect class. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). As a result, classifications on the basis of disability are subject to rational basis scrutiny, meaning they violate the Equal Protection Clause "if they lack a rational relationship to a legitimate governmental purpose." *Lane,* 541 U.S. at 522. Under this standard, a legislative classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

11

The CSCDs argue "it was clearly reasonable for the CSCDs to save money by relying on Luke's mother to interpret for her son." Dkt. 55, at 15 (citing *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 372 (2001)). Luke responds that the CSCD's "one-sentence" justification for its classification is "non-sensical," and that the CSCDs fail to provide any information to support their argument, such as documentation on costs associated with hiring interpreters. Dkt. 57, at 10.

Parties attacking the presumption of validity extended to classifications "have the burden 'to negative every conceivable basis which might support it.'" *Beach Commc'ns, Inc.*, 508 U.S. at 318 (internal citation omitted). Luke has not met his burden in order to overcome the presumption of validity afforded classifications subject to rational basis review. The CSCDs' classification and proffered cost saving justification, therefore, passes rational basis review. *See, e.g., Garrett*, 531 U.S. at 372 (finding that "it would be entirely rational (and therefore constitutional) for a state employer to conserve scarce financial resources by hiring employees who are able to use existing facilities"). Luke, therefore, has not pleaded a violation of the Fourteenth Amendment's Equal Protection clause. Because Luke has not pleaded a violation of the Fourteenth Amendment, the undersigned proceeds to the third prong of the *Georgia* analysis.

2.      Step Three: Whether abrogation is nevertheless valid

The third step of the *Georgia* abrogation test asks whether, as applied to the conduct alleged by Luke, Title II of the ADA nevertheless validly abrogates the CSCDs' sovereign immunity. Congress's abrogation power is "'nevertheless valid'

12

where Title II imposes requirements that are 'congruent and proportional' to an identified 'pattern of [unconstitutional] exclusion and discrimination'—even if it sweeps in some conduct that is not itself unconstitutional." *Lane*, 541 U.S. at 531; *see also City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).

There are two pre-*Georgia* cases that primarily guide the determination of whether Title II validly abrogates the CSCDs' sovereign immunity, *Reickenbacker* and *Lane*. In *Reickenbecker v. Foster,* the Court held that because Title II does not merely act as a "prohibition on unconstitutional discrimination" but "creates an affirmative accommodation obligation on the part of public entities," which "far exceeds that imposed by the Constitution," Title II is not proportional and congruent to "legislative findings of unconstitutional discrimination against the disabled by the States." 274 F.3d 974, 983 (5th Cir. 2001). However, in *Lane*, the Court found Title II's accessibility requirements "congruent and proportional to its object of enforcing the right of access to the courts" and held that "Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services." 541 U.S. at 531.

The CSCDs argue that *Lane* is limited to "right of access" to the courts, and that Luke's claims relating to the CSCDs failure to provide him with an ASL translator falls outside of that ambit.  Dkt. 55, at 16. Therefore, the CSCDs claim, *Reickenbecker* applies here and urges a finding that Title II is not proportional and congruent, and therefore does not validly waive the CSCDs sovereign immunity.  Dkt. 55, at 9. The first step then is to determine the scope of *Lane's* holding and the second

13

step is to determine whether Luke's claim relating to the denial of his request for an ASL translator is covered by that holding.

In *Lane*, the first plaintiff was a wheelchair-bound man forced to crawl up two flights of stairs to reach a hearing on the second floor of the courthouse at which he was "compelled to appear to answer a set of criminal charges." 541 U.S. at 513. Upon attempting to make his second appearance he "refused to crawl or to be carried by officers to get to the courtroom" and was later arrested and jailed for his failure to appear. *Id.* The second plaintiff, Jones, was wheelchair-bound certified court reporter who alleged she had lost work because of her inability "to gain access to a number of county courthouses" and had "lost both work and an opportunity to participate in the judicial process." *Id.* at 514.

In addressing whether Congress validly abrogated state sovereign immunity, the Supreme Court outlined the purpose of Title II of the ADA. *Id.* at 516. Based in part on Congress's findings concerning a history of "unequal treatment" that "relegated [disabled individuals] to a position of political powerlessness" and "[i]nvoking the 'sweep of congressional authority including the power to enforce the fourteenth amendment[,]' the ADA is designed 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Id.* (citing 42 U.S.C. §§ 12101(a)(7), b(1), b(4)). The ADA "forbids discrimination against persons with disabilities" in the provision of public services, programs, and activities under Title II by public entities, "including state and local

governments, as well as their agencies and instrumentalities." *Id.* (citing 42 U.S.C. § 12131(1)).

After finding that Congress "unequivocally expressed its intent to abrogate [sovereign] immunity," the Court moved on to whether Congress "acted pursuant to a valid grant of constitutional authority." *Id.* at 517. The Court, citing *Nevada Dept. of Human Resources v. Hibbs,* 538 U.S. 721, 727-28 (2003), found that "[w]hen Congress seeks to remedy or prevent unconstitutional discrimination, § 5 authorizes it to enact prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the Equal Protection Clause." *Id.* at 518. The test for whether § 5 legislation is valid is whether it exhibits "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520 (internal citation omitted).

Beyond enforcing the Equal Protection Clauses' prohibition against "irrational disability discrimination," the Court found that Title II also "seeks to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review … includ[ing] some, like the right of access to the courts … that are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 522-23 (citations omitted). The Court further explained that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Id.* at 524. The Court listed a number of examples, including:

> [prohibitions on] engaging in activities such as marrying and serving as jurors[;] … unconstitutional treatment of disabled persons by state

agencies in a variety of settings … a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system, public education, and voting … [demonstrating] a pattern of unconstitutional treatment in the administration of justice.

*Id.* at 524-25.

With respect to the provision of services to disabled individuals, the Court noted that Congress's appointed task force on accessibility "heard numerous examples of the exclusion of persons with disabilities from state judicial services and programs, including exclusion of persons with visual impairments and hearing impairments from jury service, failure of state and local governments to provide interpretive services for the hearing impaired, failure to permit the testimony of adults with developmental disabilities in abuse cases, and failure to make courtrooms accessible to witnesses with physical disabilities." *Id.* at 527 (citing Task Force on the Rights and Empowerment of Americans with Disabilities, From ADA to Empowerment (Oct. 12, 1990)).

Ultimately, based on this record demonstrating the "nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services … justify[ing] Congress' exercise of prophylactic power" the Court found "Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services." *Lane*, 541 U.S. at 531. Further, finding Title II's requirement of program accessibility "congruent and proportional to its object of enforcing the right of access to the courts," the Court held Title II validly abrogated sovereign immunity as to cases involving access to the courts. *Id.* at 533-34.

The CSCDs interpret *Lane's* holding as limited to cases implicating the "right of access to the courts" to the exclusion of Luke's claims regarding the provision of an ASL interpreter. While *Lane* references both "access to the courts" and "judicial services," the text of *Lane* makes it clear that the right of access to the courts falls under the wider umbrella of "judicial services." *See id.* at 530-31.[5] The Fifth Circuit has also characterized *Lane*'s holding consistent with this interpretation. *See Pace v. Bogalusa City Sch. Bd.,* 403 F.3d 272, 287 (5th Cir. 2005) ("[T]he Supreme Court, in *Tennessee v. Lane,* held that Title II abrogates sovereign immunity to the extent that it implicates the accessibility of judicial services, but refused to consider its application to other rights, including those considered to be fundamental under the Constitution.").

The next question is whether Luke's claim relating to the CSCDs' failure to provide an ASL interpreter implicates the accessibility of judicial services. The undersigned finds that it does. The Lee and San Jacinto County CSCDs, which supervise offenders who are sentenced to community supervision by local courts, are established by district judges in each judicial district and organized within local judicial districts. Tex. Loc. Gov't Code § 76.002. Supervision department employees work for the judicial districts, and the judicial districts pay their salaries and provide

---

[5] "Whatever might be said about Title II's other applications, the question presented in this case is not whether Congress can validly subject the States to private suits for money damages for failing to provide reasonable access to hockey rinks, or even to voting booths, but whether Congress had the power under § 5 to enforce the constitutional right of access to the courts. Because we find that Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services, we need go no further." *Lane*, 541 U.S. at 530-31 (citing *United States v. Raines*, 362 U.S. 17, 26 (1960)).

office space, equipment, and other forms of support. *Id.* § 76.006(b).[6] Luke pleads that he was placed on a one-year probation by a Lee County Court Judge to be overseen by the Lee County CSCD (and later, the San Jacinto County CSCD). Dkt. 54, at 7. Given the relationship between the CSCDs and the local court districts, as outlined under the Texas Local Government Code, it is reasonable to infer that Luke's claims implicate a judicial service, that of oversight of his probation period. This interpretation is supported by *Lane*'s notation of the "exclusion of persons with disabilities from state and judicial services and programs, including … failure of state and local governments to provide interpretative services for the hearing impaired." *Lane*, 541 U.S. at 527.

Because Luke has pleaded a claim that implicates the accessibility of judicial services, for which the Supreme Court has found Title II validly abrogates state sovereign immunity, the CSCDs are not entitled to sovereign immunity, and Luke's claims should proceed past the pleading stage.

### B. Damages

After determining that Luke pleaded facts sufficient to support compensatory damages in stating he was caused "fear, anxiety, indignity, [and] humiliation," the Fifth Circuit raised the issue of "whether compensatory damages are available to Title II Plaintiffs at all." Dkt. 47, at 7. They are. *See Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002) ("A plaintiff asserting a private cause of action for

---

[6]  *See also Who We Serve: Community Supervision & Corrections Departments*, https://www.tdcj.texas.gov/divisions/cjad/who_we_serve.html

violations of the ADA or the [Rehabilitation Act] may only recover compensatory damages upon a showing of intentional discrimination."). The closer question, and the one identified by the Fifth Circuit for disposition by the District Court, is whether emotional distress damages are available under Title II. *See* Dkt. 47, at 7 ("We leave it to the District Court to decide the effect, if any *Cummings* has on Luke's ability to recover emotional distress damages under Title II.").[7]

The CSCDs argue that *Cummings* held that emotional distress damages are not available under Section 749 of the Rehabilitation Act and that this prohibition "applies equally to Title II, as the Rehabilitation Act and Title II share the same remedies." Dkt. 55, at 19. Luke responds that "*Cummings* did not consider Title II, so the issue of whether emotional distress damages is available under Title II is not settled" by *Cummings*. Dkt. 57, at 16. Luke argues that there exists a presumption that courts may use "'any available remedy' to right a wrong when a statute's remedial provision is silent on its scope" and that the limitation on damages under the Rehabilitation Act "stems from principles of contract" that are not at issue in a non-spending clause statute like Title II. Dkt. 57, at 17. Luke asks the Court to find that the Supreme Court's holding that "'emotional distress damages are not recoverable' based on the premise that 'the statutes at issue are silent as to available remedies'" is incorrect. Dkt. 57, at 20. Luke points the undersigned to cross-

---

[7] In *Cummings v. Premier Rehab Keller, P.L.L.C.*, the Supreme Court held that emotional distress damages are not available under the Rehabilitation Act. 142 S. Ct. 1562, 1576 (2022)

19

referenced statutory texts that were not addressed in briefing or at argument in
*Cummings*. *Id.*[8]

As to damages available under Title II and the Rehabilitation Act, "[the Fifth
Circuit], as well as others, [have] noted that, because the rights and remedies under
[the Rehabilitation Act and the ADA] are the same, case law interpreting one statute
can be applied to the other." *Pace,* 403 F.3d at 287-88; *see also Barnes v. Gorman*, 536
U.S. 181, 185 (2002). *Cummings* clearly established "that emotional distress damages
are not recoverable under … Spending Clause antidiscrimination statutes[,]" such as
the Rehabilitation Act. *Cummings*, 142 S. Ct. at 1576. It follows that this
interpretation of the remedies available under the Rehabilitation Act should also be
applicable to Title II of the ADA.

Other courts' holdings support this inference. *See Faller v. Two Bridges Reg'l
Jail*, No. 2:21-CV-00063-GZS, 2022 WL 17260763, at *1 (D. Me. Nov. 2, 2022)
("[W]hile the Supreme Court in *Cummings* may have framed the limitation on
emotional distress damages as only applying to Spending Clause statutes, the plain
statutory language of § 12133 reflects a congressional policy that the remedies under
the Rehabilitation Act 'shall be' the remedies available under Title II of the ADA.");
*Hejmej v. Peconic Bay Med. Ctr.*, No. 17CV782JMASIL, 2022 WL 5429675, at *7

---

[8] Luke's statutory text argument is essentially that the Rehabilitation Act authorizes
remedies available under 42 U.S.C. § 1981a, governing damages in cases of intentional
discrimination in employment, which includes compensatory damages for "emotional pain"
and "mental anguish." Dkt. 57, at 19. However, the statutory text Luke references applies to
causes of action against programs or activities "receiving Federal Financial Assistance" and
makes remedies available to "any employee or applicant for employment" bringing a claim
under the Rehabilitation Act. 29 U.S.C. § 794(a).

(E.D.N.Y. July 6, 2023) ("Plaintiffs are precluded—by the ADA's text and the Supreme Court's ruling in *Cummings*—from seeking compensatory damages for alleged emotional distress."); *Gillette v. Oregon*, No. 3:20-CV-00513-IM, 2022 WL 2819057, at *7 n.5 (D. Or. July 19, 2022) ("The Supreme Court recently held that damages for emotional distress are not recoverable under the Rehabilitation Act, and therefore likely also under the ADA." (citing *Cummings*, 142 S. Ct. at 1576)); *Montgomery v. D.C.*, No. CV 18-1928 (JDB), 2022 WL 1618741, at *24 (D.D.C. May 23, 2022), *reconsideration denied,* No. CV 18-1928 (JDB), 2023 WL 4684897 (D.D.C. July 21, 2023) ("Title II of the ADA incorporates the 'remedies, procedures, and rights set forth in' the Rehabilitation Act, … hence, if a certain category of damages is not available under [the Rehabilitation Act], it is not available under Title II either."); *J.P. as Next Friend of A.S.W. v. Nebraska*, No. 4:22-CV-3095, 2022 WL 5254121, at *7 (D. Neb. Oct. 6, 2022). ("As a matter of law, [punitive and emotional distress damages] are unavailable to Plaintiffs under [the ADA and the Rehabilitation Act].").

The undersigned finds, consistent with the holding in *Cummings* as to emotional distress damages under the Rehabilitation Act and the general principle that the rights and remedies under Title II and the Rehabilitation Act are the same, that emotional distress damages are not available under Title II.

## IV.    RECOMMENDATION

In accordance with the foregoing discussion, the undersigned **RECOMMENDS** that the District Court **DENY** the CSCDs' Motion to Dismiss, Dkt. 55, as to the CSCDs' sovereign immunity and **GRANT** the motion as to Luke's claims

for emotional distress damages. Luke's claims for emotional distress damages under Title II should be **DISMISSED WITH PREJUDICE**.

**V.    WARNINGS**

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED August 3, 2023.

DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE